JAC: USAO2008R00510

_____FILED _____ENTERED
_____LOGGED _____RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUL 17 2008

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DEPOSIT BOX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL NO. **RWT 08 CR 0344** |
| RICHARD ALLISON, | * | (Conspiracy, 18 U.S.C. § 1349) |
| Defendant | * | |

\*\*\*\*\*\*

## INFORMATION

### COUNT ONE
(Conspiracy)

The United States Attorney for the District of Maryland charges that:

At all times relevant to this Information:

1. Metropolitan Money Store ("MMS") was a Maryland corporation which did business in Maryland, Virginia, and the District of Columbia and offered to financially distressed homeowners foreclosure consultation and credit services, including its "Foreclosure Reversal Program." MMS was located in Lanham, Maryland, employed 35 individuals, and was not a licensed mortgage broker or credit repair business.

2. Fordham & Fordham Investment Group, Ltd. ("F&F") was a Maryland corporation that assisted MMS in its foreclosure consulting and credit servicing business. F&F was based in Lanham and Greenbelt, Maryland, employed three individuals, and was not a licensed credit repair business.

3. Burroughs & Smythe Financial Services, Inc. ("B&S") was a Maryland corporation that assisted MMS in its foreclosure consulting and credit servicing business. B&S

was based in Lanham, Maryland, employed two individuals, and was not a licensed credit repair business.

4. JC and JC Investments LLC, RAC Investment Property LLC, and Prosper Investments LLC were Maryland corporations that provided real estate investment services.

5. Defendant **RICHARD ALLISON** ("**ALLISON**") was a resident of Maryland and a licensed attorney in Maryland and the District of Columbia. **ALLISON** has been employed by the United States Census Bureau since in or about 1994.

6. Joy Jackson ("Jackson"), a Maryland resident, was the president of MMS and a director and the resident agent of MMS and F&F. Jackson was a Maryland licensed mortgage broker but was not licensed to provide credit repair services.

7. Jennifer McCall ("J. McCall"), a Maryland resident, was the chief executive officer ("CEO") of MMS, a director and the resident agent of MMS and B&S, and owner of JC and JC Investments LLC. J. McCall was a Maryland licensed mortgage broker and notary but was not licensed to provide credit repair.

8. Kurt Fordham ("Kurt Fordham"), a Maryland resident, was the president of F&F and a director of F&F and B&S. FORDHAM was married to JACKSON.

9. Clifford McCall ("C. McCall"), a Maryland resident, was the president of B&S and a director of B&S and F&F. C. McCall was married to J. McCall.

10. Chandra Jones ("Jones"), J. McCall's daughter and a Maryland resident, was the vice-president of F&F and a director of B&S.

11. Katisha Monique Fordham ("Katisha Fordham"), a Washington, D.C. resident, was a MMS loan officer and Kurt Fordham's sister.

12. Ronald Chapman ("Chapman"), a Maryland resident, was a MMS loan officer and owned and operated RAC Investment Property LLC.

13. Title Company One was a Maryland limited liability company and Maryland-licensed title insurance company, which operated in Rockville, Maryland and conducted real estate settlements, issued title insurance, and acted as an escrow agent for MMS and others.

14. Defendant Wilbur Ballesteros ("Ballesteros"), a Maryland resident and licensed real estate closing agent, worked for Title Company One and conducted real estate settlements for MMS.

15. Title Company Two was a Maryland limited liability company and Maryland-licensed title insurance company, which operated in Largo, Maryland and conducted real estate settlements, issued title insurance, and acted as an escrow agent for MMS and others.

16. **Co-Conspirator A** was a Maryland resident and attorney, owned and operated Title Company Two and conducted real estate settlements for MMS.

17. **Co-Conspirator B**, a Maryland resident, was an MMS loan officer and owned and operated Prosper Investment LLC.

18. Credit Company One was a Maryland-licensed credit counseling company, which operated in Takoma Park, Maryland and provided credit repair services for homeowners and straw buyers.

## The Conspiracy

19. Beginning in or about December 2005, and continuing through in or about June 2007, in the District of Maryland and elsewhere, the defendant,

### RICHARD ALLISON,

did unlawfully, knowingly and willfully conspire, combine, confederate and agree with Joy Jackson, Jennifer McCall, Kurt Fordham, Clifford McCall, Chandra Jones, Katisha Fordham, Ronald Chapman, Wilbur Ballesteros and other persons known and unknown to the United States to knowingly devise a scheme and artifice to defraud homeowners and mortgage lenders, and to obtain money and property from homeowners and mortgage lenders, by means of materially false and fraudulent pretenses, representations, and promises, and material omissions ("the scheme to defraud") and for the purpose of executing and attempting to execute the scheme to defraud would and did (1) cause a matter and thing to be delivered by mail and private and commercial interstate carrier according to the direction thereon, in violation of 18 U.S.C. § 1341; and (2) transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of 18 U.S.C. § 1343.

## Manner and Means of the Conspiracy

### A.   The Fraudulent Solicitations

20. It was a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others marketed MMS's services through solicitations and television, radio, and print advertisements.

21. It was further a part of the conspiracy that when the homeowners responded to MMS's solicitations and advertisements, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others met with the homeowners and offered them two options as part of the scheme. The homeowners were told that the first option was to refinance their existing mortgage, but that they did not meet MMS's requirements for this option. Consequently, the promoters recommended the second option, MMS's "Foreclosure Reversal Program," telling the homeowners that this option would allow them to avoid foreclosure, keep their homes, and repair their damaged credit.

22. It was further a part of the conspiracy that in order to convince the homeowners to enroll in the "Foreclosure Reversal Program," Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others obtained the homeowners' credit reports and made material omissions and failed to disclose information to the homeowners, which included, but was not limited to: the ability of the homeowners to refinance their existing mortgages; the use of the homeowners' equity in their homes once enrolled in the Foreclosure Reversal Program; the fact that MMS, F&F, and B&S would not actively assist in the repair of the homeowners' credit; and the fact that the straw buyers were often the Defendants, their friends or relatives, or an employee of MMS, F&F, or B&S.

B. **The Straw Buyers**

23. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others identified persons to be straw buyers who fit a financial profile – specifically, a particular threshold credit rating, as measured by commercial credit rating agencies – that would enable them to obtain

favorable mortgages from the lenders to purchase the homeowners' properties in the straw buyers' names.

24. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others represented to the straw buyers that the straw buyers would hold title to the property for a one-year period, after which MMS would facilitate the "re-purchase" of the property from the straw buyers and return title of the property back to the homeowners.

25. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others would tell the homeowners and the straw buyers that MMS or F&F would make all the mortgage payments on the property during the one-year period even though the loans were in the straw buyers' names.

26. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others would arrange for the straw buyers to relinquish their interest in and control over the properties to MMS upon completion of the closing of the mortgage or loan.

27. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others provided the straw buyer with $10,000 in return for their participation once the property closing had occurred.

28. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirators A and B, MMS, F&F, B&S employees, and family members of Jackson, J. McCall, C. McCall, and

Fordham acted as straw buyers for the loans used to acquire the homeowners' properties and knowingly participated in the sham purchases of various properties with the proceeds of fraudulently obtained loans in return for money.

### C. The Fraudulent Loan Applications

29. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others sought mortgages for the target properties at values that were in excess of the properties' actual market values. To support applications for loans in excess of the properties' market values, **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others procured artificially inflated appraisals of the market value of the target properties from others not named in the Information.

30. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others obtained false income verifications and fictitious lines of credit in the names of straw buyers from Credit Company One and through other businesses owned and/or affiliated with Jackson, J. McCall, Chapman, and Co-conspirator B in order to enhance the credit worthiness of the straw buyers.

31. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others made and caused to be made, materially false statements on loan application documents, including the Uniform Residential Loan Application ("URLA") and the Housing and Urban Development Form 1 ("HUD-1"), which were submitted to the lenders by facsimile, email and other means, on behalf of the homeowners and the straw buyers purporting to accurately represent (a) their

personal and financial information and (b) the distribution of the equity proceeds from the sale of the homeowners' properties. The material false statements included, among others, the use of the property as a primary residence; occupancy agreements; monthly income; existing debts; ownership of other properties and mortgage payment obligations associated with those other properties; lines of credit with Credit Company One and other companies; employment history; source of down payments on mortgages; and distribution of proceeds.

32. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator A and Co-Conspirator B, and others caused property settlements to occur for which they submitted documents that contained material false statements which were intended to deceive and did deceive the lenders.

33. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator B and others completed most of the loan paperwork for the homeowners and the straw buyers and then facilitated the loan originations in the straw buyers' names and in some cases forged the homeowners' and straw buyers' signatures on certain loan documents.

34. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others made and caused to be made, fictitious sales contracts in the names of national real estate companies and forged the homeowners' and straw buyers' signatures on certain real estate sales contracts in order to facilitate the loan closing process and to make the fraudulent real estate transactions appear more legitimate to the lenders.

8

35. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others paid kickbacks to real estate brokers in return for their providing fictitious real estate sales contracts to MMS that falsely represented that the homeowners' properties had been listed for sale with the brokers' real estate companies and then sold to the straw buyers.

36. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others prepared and had some homeowners sign "Monthly Rental Agreements" which stated that the homeowners would not pay "rent" on their homes for a one-year period.

**D.     The Fraudulent Settlements**

37. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-conspirator B and others, in addition to the false URLAs and HUD-1 settlement statements submitted to the lenders, created and completed separate "Foreclosure Reversal Program" fee sheets, which were not disclosed to the lenders and which required the homeowners to pay numerous fees and "seller contributions" to MMS, F&F, and B&S, which were far in excess of industry standards.

38. It was further a part of the conspiracy that that after each settlement, **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-conspirator A and Co-conspirator B, and others sent and caused to be sent the closing packages to the lenders which purportedly revealed what had occurred at closing. In fact, among others, the following loan documents included in the closing packages were materially false, fictitious and misleading: the HUD-1's, loan applications, good faith estimates, mortgage notes,

deeds, disclosure statements, proof of the straw buyers' down payments and title insurance, real estate sales contracts, and the homeowners' and straw buyers' signatures.

39. It was further a part of the conspiracy that, in some instances, Ballesteros, at the direction of **ALLISON**, Jackson, J. McCall and others, would not appear at the closings but would sign the loan documents falsely certifying that he had witnessed the homeowners and straw buyers complete and sign the loan documents and would then submit those false closing documents to the mortgage lenders.

40. It was further a part of the conspiracy that J. McCall would notarize documents with forged homeowner and straw buyer signatures in order to facilitate the loan process, including, among others, the "Foreclosure Reversal Program" fee sheets.

41. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator A and Co-Conspirator B, and others concealed the payments of the proceeds of the equity-stripping scheme to MMS by causing Title Company One and Title Company Two to wire the money to MMS, F&F, B&S, JC and JC Investments LLC, RAC Investments LLC, and Prosper Investments LLC bank accounts instead of to the homeowners as stated in the HUD-1s.

42. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator A and Co-Conspirator B, and others concealed payments to MMS, F&F, and B&S by causing Title Company One and Title Company Two to issue checks for the proceeds of the sale in the names of the homeowners.

43. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-conspirator B and others forged the homeowners' endorsement signatures on checks and deposited checks into the MMS, F&F, and B&S bank accounts.

44. It was further a part of the conspiracy that Ballesteros falsely inflated the amounts due from the straw buyers and to the homeowners under the HUD-1 and then issued checks and wire transfers for the difference to MMS, F&F, B&S, JC and JC Investments LLC, RAC Investments LLC, and Prosper Investments LLC bank accounts instead of to the homeowners as stated in the HUD-1s.

45. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator A and Co-Conspirator B, and others caused homeowners and straw buyers to sign over property settlements proceeds, which were deposited into the personal bank accounts of Jackson, Fordham, and others.

E. **Distribution of Proceeds**

46. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-conspirator B, Ballesteros, and others spent the money from the mortgage loan proceeds in the following manner: monthly mortgage payments on properties already purchased, their personal expenses, and cash diversions to themselves.

47. It was further a part of the conspiracy that Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Ballesteros, Co-Conspirator A and

11

Co-Conspirator B, and others shuttled the loan proceeds through various bank accounts, including the personal bank accounts of Jackson, J. McCall, Fordham, C. McCall, and Jones, in order to pay, in part, for the personal expenses of Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, Co-Conspirator B and others, including art, cars, clothing, credit card bills, homes, fur coats, furniture, domestic and international trips, gambling expenses, jewelry, limousine services, student tuition, and a luxury wedding for Jackson and Fordham.

48. It was further a part of the conspiracy that **ALLISON**, Jackson, J. McCall, Fordham, C. McCall, Jones, Katisha Fordham, Chapman, and others stopped making the mortgage payments on the homeowners' homes and the straw buyers' loans with the equity proceeds and allowed the properties to go into foreclosure.

### Overt Acts

In furtherance of the conspiracy and scheme to defraud, and to effect the objects thereof, defendant **ALLISON** and others known and unknown to the United States committed the following overt acts in the District of Maryland and elsewhere:

1. In or about October 2005, **ALLISON** became employed by MMS and provided legal services to Jackson, J. McCall, Fordham, C. McCall, their companies MMS, F&F, B&S, and others.

2. On or about October 24, 2005, **ALLISON** received a $1,500 check drawn on F&F's bank account.

3. On or about November 1, 2005, **ALLISON** received a $1,500 check drawn on F&F's bank account.

4. In or about March 2006, **ALLISON** knowingly and willfully agreed with Jackson,

12

J. McCall, Ballesteros, Jones, Katisha Fordham, and others to participate in the conspiracy and scheme, by serving as a straw buyer for two properties: 5608 Stone Meadow Drive, Fredericksburg, Virginia ("5608 Stone Meadow Drive") and 120 Danbury Street, SW, Unit 120E, Washington, D.C. ("120 Danbury Street").

5. On or about March 30, 2006, **ALLISON** and Jackson completed, signed and submitted to a lender a Uniform Residential Loan Application in order for **ALLISON** to obtain a mortgage to purchase 120 Danbury Street, which contained, among others, the following materially false and fraudulent statements:

   a. **ALLISON** earned $12,500 per month;

   b. **ALLISON** had $5,750 in cash that he would use as a down payment for the purchase of 120 Danbury Street;

   c. **ALLISON** would provide the $5,750 down payment from his own funds; and

   iv. **ALLISON** did not own or have mortgage payment obligations associated with 5608 Stone Meadow Drive.

6. On or about March 30, 2006, during the real estate settlement for 120 Danbury Street with Ballesteros, **ALLISON**, knowingly signed a number of mortgage loan documents for the purchase of 120 Danbury Street, including a HUD-1 settlement statement, prepared by Ballesteros, to facilitate the closing of a mortgage in **ALLISON**'s for 120 Danbury Street which:

   a. failed to disclose that **ALLISON** would not pay any of the mortgage payments due to be paid to the lender;

   b. falsely stated that at settlement **ALLISON** would provide $8,059.74; and

   c. failed to disclose that $68,735.68 in equity proceeds payable to homeowner T.C.

would be deposited into F&F's bank account.

7. On or about March 30, 2006, A package containing these materially false real estate settlement documents for the purchase of 120 Danbury Street, including the false HUD-1, were then delivered via interstate commercial carrier from Title Company One's office in Rockville, MD to the lender, New Century Mortgage Corporation, in Reston, VA.

8. On or about April 10, 2006, **ALLISON** received a $10,000 check drawn on F&F's bank account.

9. On or about May 9, 2006, **ALLISON** received a $10,000 check drawn on F&F's bank account.

10. On or about August 18, 2006, **ALLISON** received a $800 check drawn on F&F's bank account.

11. On or about September 15, 2006, **ALLISON** received a $1,900 check drawn on F&F's bank account.

12. On or about November 15, 2006, **ALLISON** sent an e-mail to Ballesteros at Title Company One regarding the facilitation of a settlement at MMS, explaining "Will, I really need you to help me knock out this matter. Time is of the essence. If you can get me the requisite signature, I'll go and file it myself. But I REALLY need to get this done ASAP!!!"

13. On or about November 20, 2006, **ALLISON** sent an e-mail to Ballesteros at Title Company One regarding the facilitation of a settlement at MMS, explaining, "Will, I took off of work today. Please let me know what time and where I can link up with you. The owner is under contract to sell the property so they will need a copy of the new deed with the receipts at

settlement since the joint won't be in the system quick enough. I really have to get this one wrapped up quick!! Thanks! Rick."

18 U.S.C. § 1349

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION — U.S. DISTRICT COURT | | |
|---|---|---|
| By: ___ Complaint   X Information   ___ Indictment | Name of District Court, (City) Greenbelt, Maryland Southern Division | **RWT 08 CR 0344** |
| **Offense Charged** Receipt of a Firearm Unlawfully Imported into the United States; Transfer of an Unregistered Firearm      ___ Petty   ___ Misdemeanor   X Felony | **Defendant - U.S. vs.** Richard Allison  Address: _____ Birth date:* 1971   Male/Female M   Alien (Y/N): N  * (Optional unless a juvenile) | |
| **Place of offense** Prince George's County | **U.S.C. Citation** 18 U.S.C. § 1349 | |

| Proceeding | Defendant |
|---|---|
| **Name of Complainant Agency, Person (& Title, if any) & Phone#** Special Agent Jennifer Perry 301 586-4539 | **IS NOT IN CUSTODY** 1) X Has not been arrested, pending outcome of this proceeding. If not detained give date any prior summons was served on above charges. |
| ☐ Person is awaiting trial in another Federal or State Court, give name of court: | 2) ___ Is a fugitive |
| | 3) ___ Is on bail or release from (show District) |
| ☐ This person/proceeding is transferred from another district per: FRCrP 20 ☐ 21 ☐ 40 ☐ Show District | **IS IN CUSTODY** 4) ___ On this charge |
| ☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of: ☐ U.S. Attorney   ☐ Defense    Show Docket # | 5) ___ On another conviction   ___ Federal   ___ State |
| ☐ this prosecution relates to a pending case involving this same defendant | 6) ___ Awaiting trial on other charges If the answer to (6) is "Yes", show name of institution _____ |
| ☐ prior proceeding or appearances before U.S. Magistrate Judge regarding this defendant were recorded under    Magistrate # | Has detainer been filed? Y/N ☐   Date filed _____ Date of Federal arrest    **OR** Date Transferred to Federal Custody _____ |
| **Name & Office of Person furnishing information on this form** Rod J. Rosenstein U.S. Attorney | X Check if plea is expected. ☐ This report amends AO 257 previously submitted |
| Name of Asst. U.S. Att'y  James Crowell Phone Number:  301-344-4235 | **FOR USE OF THE CLERK'S OFFICE** |
| **Additional Information or comments:** | |
| Maximum Penalty:  30 yrs., 5 yrs. SR, $1,000,000 Fine | |
| Date of offense:  December 2005 | |
| Length of Trial:  2 weeks | |
| HIDTA CASE:   ___ Yes   X No | OCDETF CASE:   ___ Yes   X No |